IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARYELLEN WILKEN, | CASE NO. 3:22-CV-01783-JJH |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Maryellen Wilken filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In July 2020, Wilken filed an application for disability insurance benefits alleging a disability onset date of April 15, 2020,[1] and claiming that she was disabled due to depression, bipolar disorder, and insomnia. Tr. 55, 172,

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

208, 278. The Commissioner denied Wilken's application at the initial level and upon reconsideration. Tr. 54–61, 62–67. Wilken requested a hearing before an Administrative Law Judge (ALJ). Tr. 79–80. In June 2021, an ALJ held a hearing at which Wilken and a vocational expert testified. Tr. 31–53. In August 2021, the ALJ issued a written decision finding that Wilken was not disabled. Tr. 12–30. The ALJ's decision became final in August 2022, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Wilken filed this action in October 2022. Doc. 1. She asserts a single assignment of error:

> THE ADMINISTRATIVE LAW JUDGE'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE WHEN SHE DID NOT PROPERLY EVALUATE THE OPINION OF THE PLAINTIFF'S TREATING NURSE.

Doc. 8, at 11.

## Factual background

### 1. *Personal and vocational evidence*

Wilken was born in October 1982 and was 37 years old on her alleged onset date. Tr. 55. She graduated from high school and nearly completed the requirements for a degree from Bowling Green State University.[2] Tr. 209, 301. Wilken previously worked as an office administrator at a temporary employment agency, a bartender, a groundskeeper, a teacher's aide, a production assistant on an assembly line making automotive parts, and a service technician for industrial furnaces. Tr. 38–39, 209.

---

[2] Wilken described herself as having been "two associates and one class away" from obtaining her bachelor's degree. Tr. 301.

*2.  Relevant medical evidence before alleged onset date April 15, 2020*[3]

In February 2018, Wilken was diagnosed with major depressive disorder and insomnia. Tr. 375, 376, 377–78, 383–90. In January 2019, Wilken's mental health provider became unresponsive and Wilken was not able to obtain her medications. *See* Tr. 299. As a result, Wilken sought emergency psychiatric care at a hospital. *Id*. The next month, Wilken was diagnosed with bipolar I disorder.[4] Tr. 289.

In January 2020, Wilken established psychiatric care with Joseph Keppler, APRN.[5] Tr. 299–305. Wilken told Keppler that her bipolar symptoms had been "stable with treatment for many years" and listed the medications—Clonazepam, Lamictal, Geodon, Propranolol, Wellbutrin, and Doxepin—that controlled her symptoms well. Tr. 299, 301–02. Wilken indicated that her medication hadn't needed to be adjusted since the previous year, and that the

---

[3]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Wilken's appeal is based on the ALJ's evaluation of mental impairment medical opinion evidence only. I have limited my discussion of the facts accordingly.

[4]     An individual with bipolar I disorder has had least one manic episode, a period of abnormally elevated or irritable mood and high energy accompanied by abnormal behavior that disrupts life. *Bipolar I Disorder*, WebMD, https://www.webmd.com/bipolar-disorder/bipolar-1-disorder [https://perma.cc/8F2D-Y7PU]. Most people with bipolar I disorder have also experienced episodic cycles of depression. *Id*.

[5]     APRN is an initialism for advanced practice registered nurse. *See* Advanced Practice Registered Nurse, Provider Recruitment, Cleveland Clinic, https://my.clevelandclinic.org/professionals/provider-recruitment/advanced-practice-registered-nursing [https://perma.cc/VWJ5-EKTT].

stable combination of medications was still effective in managing her symptoms. *See* Tr. 299. Wilken said that "when she wasn't stable on her medications," she experienced periods of depression for as long as two weeks during which she "had no feeling" and didn't want to leave her house. Tr. 300. She reported once having a "full blown panic attack" after not sleeping for weeks. *Id*.

Keppler diagnosed Wilken with bipolar I disorder—her most recent episode having been manic and moderate—and insomnia. Tr. 305. Keppler noted that Wilken appeared calm and relaxed. *Id*. He found Wilken pleasant and engaged with good insight into her illness. *Id*. Wilken's mental status examination was normal. Tr. 303. Keppler recommended that Wilken begin formal psychotherapy. *Id*. He replaced Clonazepam with Geodon in Wilken's medication regimen and otherwise continued her medications without adjustment. Tr. 305. Keppler suggested that Wilken return for a follow-up in six months.  Tr. 303. Over the next 18 months, Wilken saw Keppler seven additional times for medication management. Tr. 306–10, 397.

3. *Relevant medical evidence after alleged onset date April 15, 2020*

At some point after January 2020, Wilken lost her job at the temporary employment agency. *See* Tr. 46, 306. She initially reported being "really stressed out" by this and sought an increase in Geodon to help her sleep. Tr. 306. By her July 2020 appointment with Keppler, however, Wilken reported that she was stable and "doing really well to be honest." *Id*. Her anxiety and

depression were minimal. Tr. 309. She referred to the pandemic shutdown as "rest and relaxation" for her. Tr. 306. She reported having no depression and indicated that her mood had been "pretty good." *Id*. She was sleeping well. *Id*. Wilken felt lethargic when she woke up in the morning and had been taking caffeine pills to start her day. *Id*. Keppler advised Wilken to stop taking the caffeine pills and agreed to increase her dosage of Wellbutrin instead. *See id*.

In August 2020, Wilken reported feeling stable. Tr. 351. She was sleeping well. *Id*. Her mood was good. *Id*. Keppler found her pleasant and bright. Tr. 354. He noted that Wilken smiled and laughed during their appointment. *Id*. Wilken indicated that her anxiety and depression were minimal but said that she still felt lethargic in the morning. *Id*. Keppler changed Wilken's Wellbutrin prescription to an extended release format and otherwise continued her medications without adjustment. Tr. 355.

In September 2020, Wilken reported that her mood was stable. Tr. 356. She was sleeping well. *Id*. She had minimal anxiety and depression, though she felt on edge at times. *Id*. At Wilken's request, Keppler replaced her prescription for Doxepin with Trazadone. Tr. 360. Keppler continued Wilken's other medications without adjustment. *Id*.

In October 2020, Wilken reported that her mood was stable. Tr. 364. She had minimal anxiety and depression. *Id*. Her mental status examination was normal. Tr. 366. She told Keppler that she was pleased with Trazodone, which helped her sleep, even though it nauseated her when she awoke in the

5

morning. *Id*. Keppler continued Wilken's medications without adjustment. Tr. 368.

In early January 2021, Wilken reported that her overall mood was stable, however, she described the holidays as "crazy and abnormal" and mentioned that they caused her stress. Tr. 369. Wilken reported that her anxiety had increased, making her feel on edge and worry excessively. *Id*. She reported an increase in depression symptoms and noted her unease due to remaining unemployed. *Id*. Keppler observed that Wilken was pleasant, engaged, and sounded calm. Tr. 372. He noted, however, that her mood was anxious. Tr. 372. He prescribed Valium for Wilken to take "as needed for up to seven days" and otherwise continued her medications without adjustment. Tr. 373.

In May 2021, Wilken reported that she had financial stress. Tr. 409–14. Since she lost her job, Wilken had been relying on her parents for financial support. Tr. 409. Wilken described her mood as "mostly ok" and told Keppler that the Valium continued to help with her anxiety. *Id*. Wilken indicated that she had recently joined several social and professional groups in an effort to meet new people and "put herself out there." *Id*. Wilken's mental status examination was normal, however, Keppler found Wilken slightly more anxious and depressed than she had been previously. Tr. 412. Keppler reissued Wilken's seven-day prescription for Valium and otherwise continued her medications without adjustment. Tr. 414.

In June 2021, Wilken reported that her unemployment issues had resolved. Tr. 415. She indicated that although this had slightly calmed her anxiety, she still felt on edge and worried excessively. *Id*. Wilken reported an increase in depression symptoms including being irritable at times, feeling guilty, lacking motivation and energy, and struggling to get out of bed in the morning. *Id*. Keppler noted that Wilken "sound[ed] down[,]" but found her slightly less anxious and depressed than she had been previously. Tr. 419. Wilken reported that Valium was still helping her anxiety. Tr. 415. Keppler continued Wilken's medications without adjustment. Tr. 420. Keppler also completed a Residual Functional Capacity Questionnaire, a check-box form discussed below that concerns Wilken's ability to perform work-related activities.[6] *See* Tr. 397–401, 415.

---

[6]     A cover page that counsel completed and signed precedes the questionnaire. Tr. 396. It indicates that a "Physical/Mental RFC completed by Joseph Keppler, APRN, dated 6/17/2021" follows, however, the Residual Functional Capacity Questionnaire that follows lacks an indication of the writer's identity, isn't signed, and isn't dated. *See* Tr. 397–401.

*4. State agency and other medical opinion evidence*[7]

In September 2020, state agency psychologist Robyn Murry-Hoffman, Psy.D., reviewed the evidence and found that Wilken had mental impairments that limited her to unskilled work. Tr. 55–60. Dr. Murry-Hoffman considered the four broad areas of mental functioning assessed in a disability claim and found that Wilken was moderately limited in two such areas: (1) the ability to understand, remember, or apply information; and (2) the ability to concentrate, persist, or maintain pace. Tr. 57. More specifically, Dr. Murry-Hoffman opined that Wilken was moderately limited in the ability to carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. Tr. 58–59. Dr. Murry-Hoffman found Wilken mildly limited in the ability to interact with others and the ability to adapt or manage oneself. Tr. 57. Wilken was not otherwise significantly limited by any evaluative standard. *See* Tr. 58–59. Dr. Murry-Hoffman opined that Wilken retained the capacity to perform simple tasks and

---

[7]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

to sustain such tasks as long as she didn't have to move at a fast pace or meet strict production demands. Tr. 59. Wilken could interact with others and adapt to settings where duties were relatively static and any changes were infrequent and adjusted over time. *Id*.

In October 2020, upon reconsideration, state agency psychologist Aracelis Rivera, Psy.D., reviewed the medical evidence and affirmed Dr. Murry-Hoffman's findings. Tr. 66–67.

As mentioned above, in June 2021, Keppler completed a Residual Functional Capacity Questionnaire at Wilken's request, providing a medical opinion of Wilken's ability to perform various work-related activities. Tr. 397–401. Keppler indicated that he first assessed Wilken in mid-January 2020 and had seen her a total of eight times. Tr. 397. Keppler noted Wilken's diagnosis of bipolar I disorder and indicated that her most recent episode had been manic. *Id*. Keppler listed Wilken's prescriptions as Geodon, Lamictal, Wellbutrin, Propranolol, Doxepin. *Id*. He listed drowsiness and intermittent lethargy as side effects that could affect Wilken's ability to work. *Id*. Keppler's clinical findings included "difficulty concentrating, low mood, low energy, mood lability,[8] [and] sleep disturbances." *Id*. Keppler indicated that Wilken's prognosis was "[d]ifficult to determine[.]" *Id*.

---

[8]    Labile    means    unstable.    *Labile*,    Merriam-Webster    Dictionary, https://www.merriam-webster.com/dictionary/labile    [https://perma.cc/Z8SQ-77GJ].

The questionnaire asked Keppler to rate Wilken's ability to complete work-related activities required by certain types of jobs in four broad areas of mental functioning. Tr. 399–400. There was no task in any area of mental functioning in which Keppler indicated Wilken had no useful ability to function. *Id*.

Keppler checked boxes indicating that Wilken was unable to meet competitive standards in the ability to: (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) perform at a consistent pace without an unreasonable number and length of rest periods; (3) respond appropriately to changes in the work setting; (4) deal with normal work stress; and (5) deal with stress of semiskilled and skilled work. *Id*.

Keppler checked boxes indicating that Wilken was seriously limited, but not precluded, in the ability to: (1) remember work-like procedures; (2) maintain attention for a two-hour segment; (3) maintain regular attendance and be punctual within customary, usually strict, tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being unduly distracted; (6) make simple, work-related decisions; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to criticism for supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) be aware of normal hazards and take appropriate

10

precautions; (11) understand and remember detailed instructions; (12) carry out detailed instructions; (13) set realistic goals or make plans independently of others; (14) interact appropriately with the general public; (15) maintain socially appropriate behavior; (16) adhere to basic standards of neatness and cleanliness; (17) travel in unfamiliar places; and (18) use public transportation. Tr. 399–400.

Keppler checked boxes indicating that Wilken was limited but satisfactory in the ability to: (1) understand and remember very short, simple instructions and (2) carry out very short, simple instructions. Tr. 399.

There was no task in any area of mental functioning in which Keppler indicated that Wilken's ability was unlimited or very good. Tr. 399–400.

The questionnaire asked Keppler how often, on average, he anticipated Wilken's impairments or treatment would cause her to miss work. Tr. 401. Keppler chose the pre-filled answer of "[a]bout four days per week" by adding a checkmark on the line next to that phrase. *Id*. The questionnaire asked Keppler to describe any additional reason that Wilken might have difficulty performing a regular job on a sustained basis. *Id*. Keppler referenced Wilken's—sole—previous psychiatric hospitalization and noted that her symptoms stabilized when she stopped working. *Id*.

   *5. Testimonial evidence*

Wilken and a vocational expert testified during the hearing in June 2021. Tr. 31. Wilken was represented by attorney Rachel Wilson. Tr. 31, 36,

11

46–49, 53. Before the hearing, Attorney Wilson submitted a pre-hearing memorandum with argument, analysis, and evidence for consideration. Tr. 278–80.

During the hearing, Wilken testified about bipolar disorder, with which she was diagnosed in 2003. Tr. 41–44, 48. The ALJ asked whether Wilken had periods of mania with agitation, delusions, or mind racing. Tr. 44. Wilken said that she did, and estimated that these periods happened "at least two weeks, every month." *Id*. She testified that she had a low energy level, particularly in the morning, and found it very difficult to get out of bed three to four times per week. Tr. 48.

The ALJ asked why Wilken believed that she was unable to work. Tr. 41. Wilken responded by describing herself as "non-functioning." Tr. 41. She said that she wasn't be able to work because she couldn't sleep, maintain a regular schedule, take care of herself, start or finish tasks, interact with others, or maintain a stable mood. *Id*. Wilken said that her only hospitalization for bipolar disorder, in 2019, was "purely due to work stress." Tr. 43. Wilken said that she had a breakdown while she was working as a technician and "just lost control."[9] *Id*.

---

[9]     Wilken reported working as an industrial technician from October 2018 through January 2019. Tr. 209.

Wilken listed the medications—Buproprion (Wellbutrin), Propranolol, Valium, and Trazadone—that she took for bipolar disorder.[10] Tr. 41–42, 47. She said that she experienced side effects from the medication including drowsiness, dizziness, nausea, and mood swings.[11] Tr. 48.

The ALJ asked about Wilken's memory. *Id*. Wilken testified that both her long-term and short-term memory were poor but indicated that, vocationally, her short-term memory was the main problem. Tr. 42. Wilken said that when she worked, she had trouble recalling her daily tasks or remembering how to do the job. *Id*. She forgot what she had been doing a few minutes earlier. *Id*. In her personal life, Wilken couldn't remember appointments or birthdays. *Id*.

The ALJ asked whether Wilken had any issues with concentration. Tr. 42. Wilken said that she did. Tr. 43. She was easily distracted. *Id*. Her mind raced. *Id*. She was restless and couldn't sit at her desk for a long period of time. *Id*. Wilken described experiencing hyperfocus, in that she would get stuck on an idea and lose the ability to think about anything else. *Id*. Wilken recognized

---

[10]    Portions of Wilken's testimony, including the list of her current medications, were inaudible during the hearing and the court reporter noted as much in the minutes. *See, e.g.* Tr. 41, 42, 43. In addition to the medications included in the list in the transcript, Wilken was also regularly prescribed Doxepin, Lamictal, and Geodon. *See* Tr. 299–300, 301–02, 304–05, 307.

[11]    In a November 2020 disability report, Wilken attributed her memory and concentration issues to her bipolar disorder and medications. Tr. 250. There, Wilken listed her side effects as physical fatigue, low energy throughout the day, drowsiness, dizziness, mood changes, nausea and diarrhea. *Id*.

that medication helped her manage her bipolar symptoms, however, she asserted, medication couldn't prevent her debilitating, persistent mood swings and thus she would never have a stable baseline mood or sustained mood balance. Tr. 42.

The ALJ asked whether Wilken had issues getting along with others. Tr. 43. Wilken affirmed that she did. *Id*. Wilken found it difficult to interact with society, friends, family, and "especially coworkers." Tr. 41. With certain people, Wilken had "zero patience." Tr. 43. She had a short temper. *Id*. She was defensive at work and did not take criticism well. *Id*. She could be "non-cooperative" and wouldn't want to work with certain people or help them. *Id*.

The ALJ asked whether Wilken had auditory or visual hallucinations. Tr. 45. Wilken affirmed that she did. *Id*. She said that "maybe one or two times a week" she saw figures and colors that weren't there. Tr. 45. The ALJ noted that visual hallucination wasn't reported in the treatment notes and asked whether Wilken had mentioned it to her therapist or psychiatrist. *Id*. Wilken asserted that her "old psychiatrist knew" but that she usually didn't mention the hallucinations because they were "something [Wilken could] manage" and that she didn't find debilitating. *Id*.

The ALJ asked whether Wilken had other impairments beyond bipolar disorder and insomnia about which the ALJ should be aware. Tr. 45. Wilken responded that she also suffered from migraines. *Id*. She said that her migraines lasted for an entire day and were "stress-related" "so" she got them

14

"twice a week, when working." Tr. 45–46. Wilken treated her migraines with over-the-counter medication. Tr. 46.

After the ALJ finished questioning Wilken, the ALJ allowed Attorney Wilson to inquire. Tr. 46. Under Wilson's questioning, Wilkens testified about the issues she had in performing her most recent job at the temporary employment agency. Tr. 46. Wilken said that the thought of going to work increased her anxiety and gave her a sense of overwhelming dread. Tr. 47. This led her to become unreliable at work. Tr. 46–47. Wilken regularly failed to show up and was rarely, if ever, on time when she did. *Id*. She took frequent breaks and often left early. *Id*. Wilken was late or absent about four or five times per month. Tr. 47. She said that she "just couldn't take it anymore" and couldn't handle the day, the people, or the situation. *Id*.[12]

After Wilken, certified rehabilitation counselor and vocational expert Laura Frailey testified. Tr. 34, 49–52. Frailey classified Wilken's previous

---

[12]    In a November 2020 disability report, Wilken wrote that she had become:

> undependable to show up to work every day, show up on time[,] or work 5 days a week. [She could not] be relied upon to follow or maintain a schedule or work routines. There [was] no consistent accuracy with [her] work behavior or work performance. [She was] uncooperative within [her] work environment towards coworker[s], supervisors and the public. When working[, she was] very irritable within social interactions or interactions with fellow employees

Tr. 250.

relevant work as a furnace installer as unskilled labor that required heavy exertion under the Dictionary of Occupational Titles and medium exertion as performed by Wilken. Tr. 50. As a production line assembler, Wilken had performed light, unskilled work. *Id.*

Frailey said that a hypothetical individual with the same age, education, and work experience as Wilken would not be able to perform any of Wilken's past work if such an individual had the limitations assessed in Wilken's residual functional capacity (RFC),[13] described below. Tr. 51. The individual could, however, perform medium, unskilled labor such as a sweeper/cleaner or hospital cleaner. Tr. 51–52. The individual would be precluded from all work if he or she was off task 15 percent or more during the workday, required frequent redirection throughout the day to remain on task, or was absent more than one to one and a half days per month or eight to nine days annually. Tr. 52.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

---

[13]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

2. The claimant has not engaged in substantial gainful activity since April 15, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairment: bipolar disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple tasks in a routine work environment, but not at a production rate pace, for example no assembly line work. She is limited to occasional changes in the workplace, that are well explained. She is limited to occasional interaction with supervisors, co-workers, and the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on October 26, 1982 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

17

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–26.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

18

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

Wilken challenges the ALJ's treatment of Keppler's medical source opinion, arguing that the ALJ failed to properly assess the supportability and consistency of Keppler's findings in accord with 20 C.F.R. § 416.1520c(a). Doc. 8, at 12. Wilken initially claims that the ALJ rejected Keppler's medical source opinion, however, she later concedes that the ALJ found Keppler's opinion "somewhat persuasive." Doc. 8, at 11, 12. She argues that the supportability and consistency factors were met by Keppler's findings, which Wilken argues are consistent with her statements to Keppler during their appointments, her

statements to the ALJ during the hearing, and her statements "in reports to the agency." Doc. 8, at 14. Wilken asserts that Keppler's opinion is not inconsistent with Keppler's patient notes and other evidence in the record, and that his opinion is supported by the evidence overall. *Id*. Wilken does not cite the record in support of these claims.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 404.1520c(a), (c)(1)–(5); Doc. 8, at 14. Supportability and consistency are the most important factors, 20 C.F.R. § 404.1520c(a), Doc. 8, at 13; and the Commissioner must explain these factors when discussing a medical opinion, 20 C.F.R. § 404.1520c(b)(2), Doc. 8, at 13 (internal citations omitted). An ALJ is required to articulate how he or she considered the findings of a medical source, 20 C.F.R.§ 404.1520c(a); *Brokenshire v. Comm'r of Soc. Sec.*, No. 3:21-cv-01816, 2023 WL 2972993, at *8 (N.D. Ohio Mar. 6, 2023), *report and recommendation adopted* 2023 WL 2660188 (N.D. Ohio Mar. 28, 2023), but generally isn't required to discuss any of the remaining factors. *Id*.

"A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, No. 1:19-cv-02261, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and

citation omitted). The consistency standard is the principle that "the more consistent a medical opinion is with the other medical and nonmedical evidence in the record, the more persuasive it will be." *Brokenshire*, 2023 WL 2972993, at *8 (*citing* 20 C.F.R. § 404.152c(c)(2)). "[T]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard." *Id* (citing 20 C.F.R. § 404.152c(c)(1)).

There are a few problems with Wilken's argument. Wilken disregards the ALJ's decision, which documents the ALJ's consideration of Keppler's opinion and the rationale for finding its persuasiveness diminished. Tr. 23. The ALJ reviewed Keppler's check-box medical-source opinion in the form of a pre-printed questionnaire and summarized Keppler's findings. Tr. 23 (citing Tr. 399, 400, 401). The ALJ determined that Keppler's opinion was vague, noting that it was based on imprecise check-box answers that did not corelate with specific vocational limitations. *See* Tr. 23. The ALJ wrote that an RFC is "the most that a claimant can perform despite his limitations." *Id* (citing 20 C.F.R. 404.1525(a)(1)). Yet the terms used in Keppler's check-box form did not match the work-related limitations used in RFC determinations. *See* Tr. 23; *see also* Tr. 397–401. In the Sixth Circuit, an opinion expressed in a check-box form, without any further explanation to support the conclusions, is "weak evidence." *Pruitt v. Comm'r of Soc. Sec.*, No. 22-5152, 2022 WL 4517094, at *4 (6th Cir.

Sept. 28, 2022) (citing *Hernandez v. Comm'r of Soc. Sec.*, 644 F.App'x 468, 474 (6th Cir. 2016)). This is a particularly appropriate characterization where the provider's findings can't be correlated to conclusions with respect to a claimant's limitations. *See Pruitt*, 2022 WL 4517094, at *4. The ALJ thus permissibly found that the imprecise alignment of Keppler's check-box form language to the work-related limitations in the RFC detracted from the overall persuasiveness of Keppler's opinion. Tr. 23.

The ALJ further found that the weight of the opinion was diminished because it was internally inconsistent. Tr. 23. Keppler had opined that Wilken was likely be absent four days per month. Tr. 23 (citing Tr. 401). The ALJ noted that this was inconsistent with Keppler's own mental status examinations, in which he generally found Wilken's memory intact, thought content logical, and behavior, insight, and judgment appropriate. Tr. 23 (citing Tr. 366, 412, 418). On these bases, the ALJ did not deem the opinion unpersuasive, and merely noted certain aspects of the opinion that diminished its persuasiveness. She provided sufficient explanation as to the factors she considered that led her to her conclusion—vagueness and inconsistency—and thus, the ALJ's decision met the requirements of 20 C.F.R. § 404.1520c(a) and (c)(1) through (5).

Wilken's argument also fails to account for the standard of review and amounts to a request that the Court to reweigh the evidence, which it cannot do. Whether, as Wilken claims, substantial evidence supports the conclusion that the Keppler's opinion could be more persuasive than the ALJ found is

irrelevant because Wilken fails to show that the ALJ's finding, that the Keppler opinion's reliance on a vague check-box form language and its internal inconsistency diminished its persuasiveness, was *not* supported by substantial evidence. Tr. 23. "So long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Here, Wilken fails to show how the ALJ's decision is not supported by substantial evidence, and does not demonstrate any flaw in the ALJ's logic. Wilken's challenge amounts to an inappropriate "invitation[] to reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022). But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (citing *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x 586, 588 (6th Cir. 2019)).

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: July 21, 2023

> */s/ James E. Grimes Jr.*
> James E. Grimes Jr.
> U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)**.**